# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
### CENTRAL ISLIP DIVISION

|  |  |
|---|---|
| EARL WRIGHT, RAMONA HOLDEN, ETTA WILLIAMS, MICHAEL HAMILTON, JOSEPH EKO, LINDA PHILLIPS, ELAINE WILHELM, ANTHONY GILLESPIE, MARK CARLISLE, VERNITA JESSIE, CHERYL RIFE, SANDY SAMENS, RUTHIE ORTIZ SOUDJIAN, | CASE NO.: 18-CV-2373-ADS-AYS |
| Plaintiffs, | |
| v. | |
| PUBLISHERS CLEARING HOUSE, INCORPORATED and PUBLISHERS CLEARING HOUSE, LLC | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS, MOTION TO STRIKE CLASS ALLEGATIONS, AND <u>MOTION TO COMPEL ARBITRATION</u>**

**SCHWABA LAW FIRM**

<u>s/ Andrew J. Schwaba</u>
Andrew J. Schwaba
NC Bar No.:  36455
212 North Tryon Street
Suite 1725
Charlotte, NC 28281
(704) 370-0220
(704) 370-0210 (fax)
aschwaba@schwabalaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………i

TABLE OF AUTHORITIES………………………………………………………………iii

I.      FACTS………………………………………………………………..……………..1

II.     SUMMARY OF ARGUMENT……………………………….…………………….....2

III.    ARGUMENT …………………………………………………………………4

    A.  PLAINTIFFS HAVE STATED A CLAIM AND HAVE
      STANDING UNDER SECTION 349……………………….……………...………..5

        1.  Defendants Provided Plaintiffs With Standing to Sue Under
           Section 349 When They Chose New York Law to
           Govern Claims Against Them……………………………………….…………..5

        2.  Plaintiffs Sufficiently Alleged Deception to Satisfy a Section 349 claim……….6

        3.  Plaintiffs Alleged Defendants' Deceptive Advertising
           Caused Their Damages……………………………………..……….…...11

        4.  Plaintiffs Sufficiently Alleged an Injury Under Section 349…….………...……13

    B.  PLAINTIFFS HAVE STATED A CLAIM UNDER DMPEA……………………..13

    C.  PLAINTIFFS HAVE STATED A PRIVATE RIGHT OF ACTION
      UNDER CAN SPAM ACT AND SECTION 369e……………………………15

        1.  Plaintiffs Have Standing Under Can Spam Act. ……………….......…….15

        2.  Plaintiffs Have Standing Under GBL 369e……………….…………..……17

    D.  CLASS ACTION ALLEGATIONS ARE APPROPRIATE WHERE
      PLAINTIFFS MAY PURSUE THEIR CLAIMS IN NEW YORK………..……..19

        1.  New York Law Applies to the Nationwide Class Because
           The Defendants Chose New York Law To Apply………………….……...……19

    E.  DEFENDANTS' MOTION TO COMPEL ARBITRATION MUST FAIL……..…20

        1.  Non-website using Plaintiffs Were Not Covered by Contract…………..…….21

2.      Defendants' Failed to Prove Their Webpage Was Seen by Plaintiffs……..……..22

3.      Website Using Plaintiffs Were Not Presented With A Contract………..………..23

4.      PCH's Purported Terms of Use Constituted an
Impermissible Browsewrap Agreement……………..………………..………..25

5.      PCH Did Not Present the Terms of Use Through
a Valid Clickwrap Agreement………………………………………..…..……29

6.      PCH's Arbitration Clause Was Unconscionable………………………...………31

       a.      PCH Arbitration Clause Was Procedurally Unconscionable…………….31

       b.      PCH Arbitration Clause Was Substantively Unconscionable………..…..32

IV.    **CONCLUSION**………………………………………………………...………..………34

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Abraham v. American Home Mortg. Servicing, Inc.,*
   947 F. Supp. 2d 222 (E.D.N.Y. 2013) ..................................................................................12

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) ……………………………………………………...........15, 16

*Am. Airlines v. Wolens,*
   513 U.S. 219 (1995) …………………………………………………………………31

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) …………………………………………………………………3, 4

*AT&T Mobility, LLC v. Concepcion,*
   131 S. Ct. 1740 (2011) …………………………………………………………………30

*Bar-Ayal v. Time Warner Cable Inc.,*
   No. 03-cv-9905 (KMW), 2006 WL 2990032 (S.D.N.Y. Oct. 16, 2006) ……………………29

*Be In, Inc. v. Google Inc.,*
   No. 12–CV–03373–LHK, 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ……………………25

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 554 (2007) …………………………………………………………………..5

*Berkson v. Gogo LLC,*
   97 F. Supp. 3d 359 (E.D.N.Y. 2015) …………………………………….……...…25, 26, 27, 31

*Brando v. Urban,*
   182 A.D.2d 287 (2nd Dep't 1992) …………………………………………………………21

*Brenner v. Gen. Plumbing Corp.,*
   13 N.Y.S.3d 849 (N.Y. Civ. Ct. 2015) ………………………………… ………………………33

*Brown Bros. Elec. Construc. v. Beam Constr. Corp.,*
   41 N.Y.2d 397 (1977) …………………………………………………………….…21, 22

*Circuit City Stores v. Adams,*
   279 F.3d 889 (9th Cir. 2002) …………………………………………………….…..35

*Cohen* v. *JP Morgan Chase & Co.,*
   418 F.3d 111 (2d Cir. 2007) ……………………………………………………………6

*Comb v. PayPal, Inc.,*
  218 F.Supp.2d 1165 (N.D. Cal. 2002) ……………………………………………..33

*CPC Intl. v. McKesson Corp.,*
  70 N.Y.2d 268 (1987) ………………………………………………………………..18

*Crawford v. Beachbody, LLC,*
  No. 14–CV–1583, 2014 WL 6606563 (S.D.Cal. Nov. 5, 2014) …………………………..26, 28

*Cruz v. FXDirectDealer LLC,*
  720 F.3d 115 (2nd Cir. 2013) …………………………………………………....5, 6, 19

*Dash ex rel. v. Seagate Tech. Holdings Inc.,*
  27 F.Supp.3d 357 (E.D.N.Y. 2014) …………………………………………7, 9, 10, 11, 12, 13

*Derbaremdiker v. Applebee's Int'l, Inc.,*
  2012 WL 4482057 (E.D.N.Y. Sept. 26, 2012), aff'd, 519 F. App'x 77
  (2d Cir. 2013) ……………………………………………………………..……9, 10

*Dowden v. Readers Digest Ass'n, Inc.,*
  2002 WL 31548776 (N.D. Tex. Nov. 12, 2002) …………………………………………14

*Drew v. Sylvan Learning Ctr. Corp.,*
  842 NYS2d 270,  2007 NY Slip. Op. 27243 (N.Y. Civ. Ct. 2007) …………………….…10, 11

*Eisen v. Venulum Ltd.,*
  244 F.Supp.3d 324 (W.D.N.Y. 2017) ……………………………………………..…32, 34

*In re Elevator Antitrust Litig.,*
  502 F.3d 47 (2nd Cir. 2007) ……………………………………………………………4

*Express Industries and Terminal Corp. v. New York State Department of Transportation,*
  93 NY2d 584 (1999) ………………………………………………………………21

*Faber v. Metro. Life Ins. Co.,*
  648 F.3d 98 (2nd Cir. 2011) ……………………………………………………………3

*Fink v. Time Warner Cable,*
  714 F.3d 739 (2d Cir. 2013) ……………………………………………………7, 8, 9

*First Options of Chicago, Inc. v. Kaplan,*
  514 U.S. 938 (1995) ………………………………………………………………20

*Fteja v. Facebook, Inc.,*
  841 F. Supp. 2d 829 (S.D.N.Y. 2012) …………………………………………...25, 26, 28

*Gaidon* v. *Guardian Life Ins. Co. of Am.*,
  94 N.Y.2d 330 (1999) …………………………………………………………………6

*Gale v. Int'l Bus. Machs. Corp.*,
  9 A.D.3d 446, 781 N.Y.S.2d 45 (2d Dep't 2004) …………………………………………..11

*Goldemberg v. Johnson*,
  8 F.Supp.3d 467, 2014 WL 1285137, 2014 U.S. Dist. LEXIS 47180
  (S.D.N.Y. 2014) …………………………………………………………………………7, 11

*Goldman v. Simon Prop., Inc.*,
  58 A.D.3d 208 (N.Y. 2008) …………………………………………………………..16, 17

*Goshen v. Mutual Life Ins. Co. of NY*,
  98 F.Supp.2d 314 (2002) ……………………………………………………………4, 6, 10, 11

*Gotlin v. Lederman*,
  483 Fed.Appx. 583 (2nd Cir. 2012) ……………………………………………………..5

*Granite Rock Co. v. International Brotherhood of Teamsters*,
  561 U.S. 287 (2010) …………………………………………………………………………20

*Gutierrez v. Autowest, Inc.*,
  114 Cal.App.4th 77 (2003) ……………………………………………………...31, 33

*Hancock v. Am. Tel. and Tel. Co., Inc.*,
  701 F.3d 1248 (10th Cir. 2012) ……………………………………………………………29

*Harris v. Publishers Clearing House*,
  2016 WL 1366654 (M.D. Tenn. Apr. 6, 2016) …………………………………….....14

*Hines v. Overstock.com, Inc.* ,
  380 Fed.Appx. 22, 24 (2d Cir.2010) ………………………………..……………..…..22, 26

*Karlin* v. *IVF Am.*,
  93 N.Y.2d 282 (1999) …………………………………………………………………..6

*Kaufman v. Sirius XM Radio, Inc.*,
  474 Fed.Appx. 5 (2nd Cir. 2012) ……………………………………………………..5

*King v. Fox*,
  7 N.Y.3d 181 (2006) …………………………………………………………………32

*Kacocha v. Nestle Purina Petcare Co.*,
  15-cv-5489 (S.D.N.Y. 2016) ……………………………………………………………13

*Koch v. Acker, Merrill & Condit Co.*,
    944 N.Y.S.2d, 452 (N.Y. 2012) …………………………………………..………..10, 11

*Koenig v. Boulder Brands Inc.*,
    995 F.Supp.2d 274 (S.D.N.Y. 2014) ……………………………………………13

*Lonner* v. *Simon Prop. Grp., Inc.*,
    57 A.D.3d 100 (2d Dep't 2008) ……………………………………………..6, 7

*Maas v. Cornell University*,
    94 NY2d 87, 93 (1999) …………………………………………………………20

*Major v. McCallister*,
    302 S.W.3d 227 (Mo.Ct.App.S.Dist. 2009) ……………………………………28, 29

*Mandel v. Liebman*,
    303 N.Y. 88 (1951) …………………………………………………………...32

*McCarthy v. Dun & Bradstreet Corp*,
    482 F.3d 184 (2nd Cir. 2007) …………………………………………………..4, 5

*Mendez* v. *Bank of Am. Home Loans Servicing, LP*,
    840 F.Supp.2d 639 (E.D.N.Y. 2012) ……………………………………………6

*Meyer v. Uber Technologies, Inc.*,
    868 F.2d 66 (2nd Cir. 2017) …………………………………………………23, 24

*Mohamed v. Uber Technologies, Inc.*,
    109 F. Supp.3d 1185 (N.D. Cal. 2015) …………………………………………29

*Nagrampa v. Mailcoups, Inc.*,
    469 F.3d 1257 (9th Cir. 2006) …………………………………………………34

*Naval v. HIP Network Servs. IPA, Inc.*,
    620 F.Supp.2d 566 (S.D.N.Y. 2009) ……………………………………………32

*Newton v. Am. Debt Services, Inc.*,
    549 Fed. Appx. 692 (9th Cir. 2013) ……………………………………………31, 33

*Nguyen v. Barnes & Noble, Inc.*,
    763 F.3d 1126 (9th Cir. 2014) …………………………………………….20, 24, 25, 26

*Nicosia v. Amazon.com, Inc.*, No. 14–CV–4513, 84 F.Supp.3d 142, 151–53,
    2015 WL 500180, at *7 (E.D.N.Y. Feb. 4, 2015), *appeal filed*, No. 15–CV–0423
    (2d Cir. Feb. 13, 2015) ………………………………………………………..…27

*NML Capital v. Republic of Argentina,*
   621 F.3d 230 (2nd Cir. 2010) ………………………………………………..……..32

*Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank, N.A.,*
   85 N.Y.2d 20 (1995) …………………………………………………...…....6, 8, 12

*Petrosino v. Stearns' Products, Inc.,*
   Case No.: 167735, (S.D.N.Y. 2018) ……………………………………..……..12

*Pollstar v. Gigmania, Ltd.,*
   170 F. Supp.2d 974 (E.D. Cal. 2000) ……………………………………...…….26

*Register.com, Inc. v. Verio, Inc.,*
   356 F.3d 393 (2d Cir. 2004) ………………………………………………………..20

*Ruston v. Town Bd. for Town of Skaneateles,*
   610 F.3d 55 (2d Cir. 2010) ………………………………………………………….9

*Scherk v. Alberto–Culver Co.,*
   417 U.S. 506 (1974) ………………………………………………………………..20

*Servidio v. State Farm Ins. Co.,*
   889 F.Supp.2d 450 (E.D.N.Y.2012) ………………………………………………..12

*Sheehy v. Big Flats Community Day.*
   73 N.Y.2d 629 (1989) ……………………………………………………….…..17, 18

*Singleton v. Fifth Generation, Inc.,*
   No. 15-cv-474, WL 406295 at 10* (N.D.N.Y. Jan. 12, 2016) ……………………………………13

*Small v. Lorillard Tobacco Co.,*
   94 N.Y.2d 43 (1999) ………………………………………………………………..12

*Specht v. Netscape Commc'ns Corp.,*
   306 F.3d 17, 35 (2d Cir. 2002) ……………………………………………………22, 30

*Starke v. Gilt Groupe, Inc.,*
   No. 13–CV–5497, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) …………………………...27

*State of New York v. Wolowitz,*
   96 A.D.2d 47, 468 N.Y.S.2d 131 (1983) ………………………………………...32, 33

*Stutman* v. *Chem. Bank,*
   95 N.Y.2d 24 (2000) ………………………………………………………….…..6, 12

*Swift v. Zynga Game Network, Inc.*,
    805 F.Supp.2d 904 (N.D. Cal. 2011) …………………………………………………… …27

*Tompkins v. 23andMe, Inc.*,
    No. 5:13-cv-05682-LHK, 2014 WL 2903752 (N.D. Cal. June 25, 2014) ……………....29, 30

*United States v. Drew*,
    259 F.R.D. 449 (C.D. Cal. 2009) …………………………………….………………25

*United States v. Martinez*,
    151 F.3d 68 (2nd Cir. 1998) ……………………………………………..…………32

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*,
    489 U.S. 468 (1989) ………………………………………………………………..20

*Voronina v. Scores Holding Co, Inc.*,
    Mem. Opin., Case No. 16-cv-2477 (S.D.N.Y. 2017) ……………………………..…………18, 19

*Worldhomecenter.com, Inc. v. KWC Am., Inc.*,
    2011 WL 4352390 (S.D.N.Y. Sept. 15, 2011) …………………………………………..…17

*Zaltz v. JDATE*,
    952 F.Supp.2d 439 (E.D.N.Y. 2013) ……………………………………………..…..27

*In re Zappos.com, Inc. Customer Data Sec. Breach Litig.*,
    893 F. Supp.2d 1058 (D. Nev. 2012) ………………………………………….………26

*Zheng v. City of New York*,
    19 N.Y.3d 556 (2012) …………………………………………………………..21, 22

**Statutes**

9 U.S.C. § 2…………………………………………………………………………31

15 U.S.C. §§ 7701, et seq…………………………………………………………...2, 3, 16, 17

39 U.S.C. §§ 3001, et seq…………………………………………………………13, 14

New York General Business Law § 349………………………………….…3, 6-13, 18,  33

New York General Business Law § 369……………………………………………..3, 16, 17, 18

**Other Authority**

Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 474 (2006) …………………………26

## I.    FACTS

For the past thirty years, Publishers' Clearing House ["PCH"] has solicited the purchase of goods by convincing consumers that a purchase will increase their chances of winning a sweepstakes, prize or drawing. (Complaint, Dkt. 1, ¶1). They have been sued by state Attorneys General of a variety of states on two separate occasions (Schwaba Dec., Ex 1 and 2) and investigated by the United States Senate. (Schwaba Dec., Ex. 3). The Defendants continue to engage in systematic deceptive marketing through blast emails, form mailings, and website programming that promise improved chances of winning prizes based on a consumer's purchase history. (Cpl, ¶¶ 41-48).

The Plaintiffs are PCH's consumers who have purchased goods because they believed a purchase would improve their chances of winning a prize. (Wright Dec., p. 2; Gillespie Dec., ¶ 5; Ferrell Dec., ¶5; Williams Dec., ¶3; Jessie Dec., ¶ 2; Samens Dec., ¶ 2). The Plaintiffs first registered with PCH's website because they believed they were entering a free contest. They did not believe they were entering into a contract with PCH, engaging in a business transaction, or requesting a service. Therefore, they had no reason to seek out, or review any terms of use on the website, nor any reason to believe that one would be necessary. (Wright Dec., p. 2; Gillespie Dec., ¶ 4; Ferrell Dec., ¶4; Williams Dec., ¶5).

The Plaintiffs never saw a "Terms of Use" hyperlink or webpage. (Wright Dec., p. 2; Gillespie Dec., ¶ 3; Ferrell Dec., ¶3; Williams Dec., ¶4; Jessie Dec., ¶ 3; Samens Dec., ¶ 4). They do not agree to arbitrate their claims. (Wright Dec., p. 3; Gillespie Dec., ¶ 7; Ferrell Dec., ¶7; Williams Dec., ¶8; Jessie Dec., ¶ 6; Samens Dec., ¶ 5). Many of them are elderly and would have significant difficulty traveling to New York without assistance, and therefore never would have agreed to arbitrate their claims in New York. (Wright Dec., p. 3; Gillespie Dec., ¶ 7; Ferrell Dec., ¶7; Williams Dec., ¶8; Jessie Dec., ¶ 6; Samens Dec., ¶ 5). They have reviewed the webpage

offered by PCH and had never seen it before PCH's motion. (Wright Dec., p. 3; Gillespie Dec., ¶ 6; Ferrell Dec., ¶6; Williams Dec., ¶6; Jessie Dec., ¶ 5; Samens Dec., ¶ 4).

## II.     SUMMARY OF ARGUMENT

The Plaintiffs' Complaint describes repeated and systematic deceptive marketing by PCH telling Plaintiffs that a purchase would enhance their chances of winning a sweepstakes. These representations were made to induce the Plaintiffs to purchase their products. The Complaint describes PCH's history of deceitful practices, which have been litigated over and over again over the years. The Plaintiffs outlined the prior settlements and investigations PCH has endured, as well as detailed examples of the specific representations PCH made to continue its deceptive practices. Plaintiffs' Complaint lays bare PCH's campaign to lure potential customers onto its rolls with the promise that, as PCH argues, no purchase is necessary to enter and buying does not help you win. Once customers provide their personal information, PCH then continually bombards its registrants with solicitations that contradict and purposefully subvert its own disclaimers, targeting the most vulnerable members of society with assurances that the way to win sweepstakes prizes is through the purchase of goods.

The Plaintiffs' Complaint details the deception by both paper mailings and digital marketing campaigns that link an entrants' order history to their chances of winning a sweepstakes. Plaintiffs' Complaint is replete with specific examples of PCH's representations to subvert its own disclaimers, prior settlements with State Attorneys General, and guidance from a United States Senate Subcommittee.

PCH's Motion offers a panoply of legal theories, but all must fail. The Plaintiffs' Section 349 claims are based on New York law that PCH itself chose. Those claims specify the deceptive marketing that caused the Plaintiffs to purchase their products, causing them to lose hundreds of

PLAINTIFFS' MEMORANDUM OF LAW
IN RESPONSE TO DEFENDANTS'
MOTION TO DISMISS

dollars each, and the Plaintiff class millions more. The allegations continue to specify that further violations of Section 349 occurred where PCH failed to adhere to the standards set forth in the Deceptive Mail Prevention Enforcement Act (DMPEA), the Can-Spam Act, and Section 369e of New York's General Business Law (GBL).

PCH takes the position that because the DMPEA, Can-Spam Act and Section 369e of the New York General Business Law do not explicitly state a private cause of action, they are free to violate the standards set out within them. However, each of these acts allows a private cause of action where they are not explicitly forbidden.

PCH's attempt to strike the class allegations is also faulty. Plaintiffs have standing to bring their claims as a class action as PCH itself has insisted that New York law governs any claims against them, regardless of the residence of PCH's targets.

Finally, PCH seeks to compel arbitration of Plaintiffs' claims. PCH cannot rely on an arbitration clause that was not seen by the Plaintiff, did not constitute a contract, was an impermissible browsewrap agreement, provided no notice to the class of its terms, and was both procedurally and substantively unconscionable.

As a result and as explained further below, PCH's motions to dismiss, strike class action allegations, and to compel arbitration must be denied.

## III.    ARGUMENT

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal,* 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly,* 550 U.S. 554*,* 570 (2007); *see also In re Elevator Antitrust Litig*., 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible").

   On a Rule 12(b)(6) motion to dismiss, the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 191 (2d Cir. 2007). Detailed factual allegations are not required, but "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *Twombly*, 550 U.S. at 570).

## A. PLAINTIFFS HAVE STATED A CLAIM AND HAVE STANDING UNDER SECTION 349.

### 1. Defendants Provided Plaintiffs With Standing to Sue Under Section 349 When They Chose New York Law to Govern Claims Against Them.

   PCH claims Plaintiffs lack standing to bring their Section 349 claims because the deceptive and practices are not alleged to have occurred in New York.  For support, the PCH cites *Goshen v. Mutual Life Ins. Co. of N.Y*. 98 F.Supp.2d 314 (2002). In *Goshen*, out-of-state plaintiffs sued a New York insurance company for the deceptive acts of the defendant's Florida insurance agent. *Id.* at 326. In making this argument, PCH ignores Plaintiffs' allegations, controlling case law, and their own preferred choice of venue.

   Plaintiffs alleged that the Defendants maintain their principal place of business in New York. (Complaint, ¶21). The substantial amount of the acts and/or omissions complained of

occurred in New York. *Id*. Moreover, the Defendant chose New York law to apply to any claims against them. The Defendants agreed that claims against them "shall be governed by the laws of the State of New York." (Complaint, ¶ 62). "All lawsuits, causes of action, disputes, or other proceedings not subject to arbitration, as a matter of law, if any, shall be brought exclusively in the state or federal courts located in the city and county of New York." (Complaint, ¶62).

Because the Defendants chose New York courts and New York law to apply to claims against them, Plaintiffs have standing to bring their Section 349 claims. The holding of *Goshen* was clarified in *Cruz v. FXDirectDealer LLC*, 720 F.3d 115, 118 (2d Cir. 2013), where the defendant maintained a foreign currency exchange trading system in New York.  In *Cruz*, the Second Circuit explained that there are two lines of decisions deriving from *Goshen*. The first were those cases in which the Plaintiff viewed a deceptive statement while in New York, citing *Kaufman v. Sirius XM Radio, Inc*., 474 Fed.Appx 5 (2d Cir. 2012) as an example. The second line of decisions are those cases focusing on where the deceptive transaction occurs regardless of where the Defendant is deceived, citing as an example *Gotlin v. Lederman*, 483 Fed.Appx. 583, 588 (2d Cir. 2012). In allowing a section 349 claim to survive, the *Cruz* court found that Plaintiffs alleged substantial acts occurred in New York, that defendants chose New York law to apply, and chose New York courts as the preferred venue. *Cruz*, 720 F.3d at 124, 125. Based on those ties, the *Cruz* court was persuaded some part of the underlying transaction occurred in New York, and plaintiffs' Section 349 claims had standing. *Id*. at 125.

Plaintiffs' claims also have standing based on the *Cruz* rationale. Here, a substantial amount of the deceptive practices were alleged to have occurred in New York. The Defendants chose New York law and New York courts to govern suits against them. As a result, Plaintiffs have standing to bring their claims in this Court.

**2.      Plaintiffs Sufficiently Alleged Deception to Satisfy a Section 349 claim.**

New York General Business Law § 349, a consumer protection measure, provides, in relevant part: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a). The law affords a private right of action to "any person who has been injured" by a violation of the section. *Id.* § 349(h); *see generally Cruz,* 720 F.3d at 122. The reach of the statute is broad, in order to "'provide [the] needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers.'" *Lonner* v. *Simon Prop. Grp., Inc.,* 57 A.D.3d 100, 109-10 (2d Dep't 2008) (citing *Karlin* v. *IVF Am.,* 93 N.Y.2d 282, 290 (1999)). In that regard, "[t]he purpose of Section 349 is to empower customers, especially the disadvantaged, and to even the playing field of their disputes with better funded and superiorly situated fraudulent businesses." *Mendez* v. *Bank of Am. Home Loans Servicing,* LP, 840 F. Supp. 2d 639, 657 (E.D.N.Y. 2012).

To establish a violation of § 349, a plaintiff must prove "[i] that the challenged act or practice was consumer-oriented; [ii] that it was misleading in a material way; and [iii] that the plaintiff suffered injury as a result of the deceptive act." *Stutman* v. *Chem. Bank,* 95 N.Y.2d 24, 29 (2000). To determine whether conduct may be deceptive under § 349, courts apply an objective standard, *Lonner,* 57 A.D.3d at 110, which asks whether the representation or omission is likely to mislead a reasonable consumer acting reasonably under the circumstances, *Gaidon* v. *Guardian Life Ins. Co. of Am.,* 94 N.Y.2d 330, 344 (1999). *See also Cohen* v. *JP Morgan Chase & Co.,* 498 F.3d 111, 126 (2d Cir. 2007) ("The New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" (quoting *Oswego* v. *Laborers' Local 214 Pension*

*Fund* v. *Marine Midland Bank,* 85 N.Y.2d 20, 26 (N.Y. 1995)).

"The New York Court of Appeals has established an objective standard for determining whether acts or practices are materially deceptive or misleading 'to a reasonable consumer acting reasonably under the circumstances.' " *Goldemberg v. Johnson & Johnson Consumer Co., Inc.,* 8 F.Supp.3d 467, 478, No. 13–cv–3073, 2014 WL 1285137, at *8, 2014 U.S. Dist. LEXIS 47180, at *23 (S.D.N.Y. Mar. 27, 2014) (quoting *Oswego Laborers' Local 214,* 85 N.Y.2d at 26). Although a court may make this determination as a matter of law, see *Fink v. Time Warner Cable*, 714 F.3d 739, 740 (2d Cir.2013) (*per curiam*), the determination is typically a question of fact. *Dash ex rel. v. Seagate Tech. Holdings Inc*., 27 F.Supp.3d 357 (E.D.N.Y. 2014).

PCH claims that Plaintiffs failed to allege the deception, causation and injury elements to state a Section 349 claim. To the contrary, the Plaintiffs' Complaint is replete with allegations of PCH's repeated deception, including allegations beyond the excerpted language of PCH's advertisements.  For example, Plaintiffs' Complaint details the history of PCH's deception, including its previous lawsuits and settlements reached with state Attorneys General around the country (Complaint, ¶¶ 25-33), including lawsuits in 1992, 2000, 2001, and 2010, which require PCH to refrain from such activities as representing to consumers that will win or are close to winning, that they are in a select group that are more likely to win, and shall not use terms indicating a consumer has an enhanced position with respect to the Sweepstakes. (Complaint, ¶ 32). The Plaintiff alleges PCH has "repeatedly and systematically" violated these agreements with the State Attorneys.

Plaintiffs' Complaint details other allegations of deception as well. Plaintiffs alleged PCH has engaged in deceptive acts, as found by the United States Senate Special Committee on Aging. These allegations include distributing marketing materials that create the impression that a

purchase of PCH products improves a consumer's chances of winning to the point that PCH was required to maintain a High Activity Consumer ("HAC") database as well as monitor any "Spiking Activity" before a sweepstakes. (¶ 34-39).

Plaintiffs' Complaint also details examples of specific marketing that violates PCH's obligations under the state Attorneys' General agreements, the Senate Special Committee on Aging and Section 349. For example, Plaintiffs' Complaint details mailings that represent they have been put on a "Winner Selection List", that PCH promised double prizes for recipients with references to their Order history, and that they were sent simulated checks for "Loyal Entrants." (¶40, 41). Plaintiffs also detailed digital marketing that included Account Tokens with the accumulation of points that increase a participant's expectation of winning, representations of "winning tips" used by past winners, notices that by placing an order a consumer will receive special benefits, that Plaintiffs' ordering history is being monitored with prize entries, and emails telling recipients that someone with their initials must be declared the winner of a drawing. (¶ 43 (a-d)). The Plaintiffs allege PCH deceived them by representing to them and Class Members that their orders would improve their chances of winning a prize. (¶ 44).

PCH cites *Fink* and *Oswego Laborers Local 214* to suggest the Plaintiffs cannot misquote or misleadingly reference the deceptive advertisements. Neither citation is applicable to the instant case, as both dealt with very different types of representations.

In *Fink*, plaintiffs claimed defendant failed to provide internet speeds that lived up to their advertisements. Defendant claimed their internet speeds were an "always-on" connection that were "three times faster than most standard DSL connections," and the "fastest, easiest way to get online." *Fink*, 837 F.Supp.2d at 281. The court considered these representations to be mere puffery. *Id*. at 284.

PLAINTIFFS' MEMORANDUM OF LAW
IN RESPONSE TO DEFENDANTS'
MOTION TO DISMISS

Similarly, *Ruston v. Town of Skaneateles*, 610 F.3d 55 (2d Cir. 2010), is irrelevant. In *Ruston*, the plaintiffs alleged an equal protection claim after the Town denied plaintiffs application to connect a residential development to sewer lines. The plaintiffs failed to state a claim because they failed to allege how the Town and Village granted the applications of specific properties that were similarly situated. *Id.* at 59-60.

Plaintiffs' allegations in this matter are distinctly different from *Fink* or *Ruston*. Plaintiffs alleged PCH violated the state Attorneys General Agreements from 2001 and 2010. (Complaint, ¶ 95(d)) (Schwaba Dec., Exs. 1 and 2). Plaintiffs alleged PCH found to have engaged in deceptive advertising by the United States Senate Committee on Aging. (Complaint, ¶ 95(e)) (Schwaba Dec., Ex. 3). Moreover, the Plaintiffs provided examples of specific factual statements in quotes made by PCH in both paper mailings, emails and their website. (Complaint, ¶¶41-48). PCH does not deny making the statements.

Remarkably, PCH relies on *Derbaremdiker v. Applebee's Int'l, Inc.,* 59 F.App'x 77 (2nd Cir. 2013) for further support.  In that case, Plaintiff filled out a survey off a receipt at a restaurant that made him eligible for a sweepstakes. The Plaintiff alleged the prize rules were deceptive because they did not inform him he was competing against patrons of other restaurants when they referred to "our guests." *Derbaremdiker*, 59 F.App'x at 7. The court found the receipt was not misleading, nor did the Plaintiff experience any injury. *Id*. at 12.

Plaintiffs' allegations in this matter are far more substantial and overwhelming than the technicality relied upon by the Plaintiff in *Derbaremdiker*. Plaintiffs' allegations are even more substantial than those found in *Dash,* in which plaintiffs alleged the defendants' hard drive packaging contained misleading statements about drive capability related to the speed of transferring data. *Dash.*, 27 F.Supp.3d at 361. Defendants argued the speed of the drive was widely

known and consistent with the speeds asserted on their website. *Id.* The *Dash* court held that while a disclaimer or clarifying language might defeat a claim of deception, the court could not determine as a matter of law that the allegations were not misleading to a reasonable consumer. *Id.* (See also *Goshen*, 98 NY2d 314, (holding that disclaimer does not bar deceptive trade practices claim); *Koch v. Acker, Merrill & Condit Co.*, 944 N.Y.S.2d, 452 (N.Y. 2012) (holding that disclaimers do not bar Section 349 claim based on deception as a matter of law; and *Drew v. Sylvan Learning Ctr. Corp.*, 842 NYS2d 270, 2007 NY Slip. Op. 27243 (N.Y. Civ. Ct. 2007) (finding a disclaimer, in spite of its guarantee, is evidence of deception).

PCH does not deny that the representations detailed in Plaintiff's Complaint were made. Instead, PCH relies on disclaimers in some of their advertisements that "No Purchase or Payment is Necessary to Win," or "Buying Won't Help You Win." Although some of the advertisements sent by PCH do include those disclaimers, many do not. Moreover, PCH repeatedly and systematically undermine those assertions in the remainder of its representations by subverting those messages with contradictory statements, overtly suggesting to Plaintiffs that consumers of PCH products get better odds for prizes. For example, Plaintiffs' allegations included PCH statements that consumers will receive "special benefits" if an order is placed that others are certain to claim. (Cpl, ¶43(c)(v)). Plaintiffs alleged PCH claimed that placing any order "would result in the customer rewards beginning instantly." (Cpl, ¶43(c)(vii)). Defendants stated "being a valued customer could really pay off!" (Cpl, ¶ 44(a)). Another: "We've reserved an EXCLUSIVE Cash Prize Just to Thank Past Orderers Like You!" (Cpl, ¶44(b)). As in *Dash*, *Goshen*, *Koch*, and *Drew*, PCH's disclaimers and clarifying language cannot defeat a claim of deception where repeated and systematic representations undermine those disclaimers.

The Complaint details marketing by PCH to lure potential customers onto their rolls with

the promise that no purchase is necessary to enter and buying does not help you win. Once customers provide their personal information, PCH then continually bombards its registrants with solicitations that contradict and purposefully subvert those disclaimers, targeting the most vulnerable members of society with assurances that the way to win sweepstakes prizes is through the purchase of goods. Such deception is well-detailed in the Complaint.

**3.     Plaintiffs Alleged Defendants' Deceptive Advertising Caused Their Damages.**

"To properly allege causation, a plaintiff must state in his complaint that he has seen the misleading statements of which he complains before he came into possession of the products he purchased." *Goldemberg,* 8 F.Supp.3d at 480, 2014 WL 1285137, at *10, 2014 U.S. Dist. LEXIS 47180, at *28 (citing *Gale v. Int'l Bus. Machs. Corp.*, 9 A.D.3d 446 (2d Dep't 2004)). In *Dash*, the plaintiff described in detail the allegedly misleading and deceptive statements contained on the Drive's packaging upon which he relied in purchasing the product. *Dash*, 27 F.Supp.3d at 361. The product packaging statements differed from disclaimers on the manufacturer's website. *Id*. The court found the reasonable inference to be drawn from such allegations was that plaintiff saw the misleading statements and, as a result of such, purchased the Drive at issue. *Id*. Accordingly, causation was sufficiently pled. *Id*.

Like *Dash*, Plaintiffs' Complaint details misleading and deceptive statements PCH made. They alleged that they made purchases after seeing the deceptive statements from PCH. (Cpl, ¶¶ 3-16). The Complaint alleges the Plaintiffs purchased products after receiving PCH's deceptive representations. PCH engages in semantics by insinuating this language only suggests a temporal proximity, (Def. Br. p. 12), but a reasonable person would read such language to allege a cause and effect relationship.

Plaintiffs have also now testified that they purchased goods because they believed a purchase would improve their chances of winning a prize. (Wright Dec., p. 2; Gillespie Dec., ¶ 5; Ferrell Dec., ¶5; Williams Dec., ¶3; Jessie Dec., ¶ 2; Samens Dec., ¶ 2). The reasonable inference from these allegations is the Plaintiffs' purchases were made as a result of PCH's deceptive advertising.   Conduct "need not reach the level of common-law fraud to be actionable." *Stutman,* 95 N.Y.2d at 29 (internal citation and quotation marks omitted). Indeed, precisely "because a private action under § 349 does not require proof of the same essential elements (such as reliance) as common-law fraud, an action under [this section] is not subject to the pleading-with-particularity requirements of Rule 9(b) [of the Federal Rules of Civil Procedure], but need only meet the bare-bones notice-pleading requirements of Rule 8(a)." *Pelman ex rel. Pelman* v. *McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir. 2005).

### 4.    Plaintiffs Sufficiently Alleged an Injury Under Section 349.

With respect to injury, it is well-settled that a consumer alleging they would not have purchased products but for defendant's deceptive marketing is sufficient to withstand a motion to dismiss. See *Dash*, supra. Plaintiffs alleged that they purchased items after seeing PCH's deceptive advertising. (Complaint,  ¶¶  3-16). Defendants cite *Abraham v. American Home Mortgage Servicing, Inc*. 947 F.Supp.2d 222, 234 (E.D.N.Y. 2013), where Plaintiffs alleged conspiracy among mortgage servicers to inflate home values. But unlike *Abraham*, Plaintiffs specifically alleged that they purchased products they otherwise would not have, and specified the deceptive statements made to them. Plaintiffs alleged they were entitled to compensatory, statutory and punitive damages. As a result, Plaintiffs have alleged actual injury from the Defendants' deceptive marketing. (See e.g. *Petrosino v. Stearns' Products, Inc*., Case No.: 167735, (S.D.N.Y. 2018) (where plaintiff's damages alleged would not have purchased products deceptively marketed as

"natural" survived dismissal); *Kacocha v. Nestle Purina Petcare Co.*, 15-cv-5489 (S.D.N.Y. 2016) (case law made clear damages alleging that plaintiff would not have purchased a product but for the deceptive marketing is sufficient at the motion to dismiss phase for a § 349 claim to survive) citing *Singleton v. Fifth Generation, Inc.*, No. 15-cv-474, WL 406295 at 10* (N.D.N.Y. Jan. 12, 2016) (where plaintiff's damages that they would not have purchased defendant's products but for the deceptive representations were acceptable) and *Koenig v. Boulder Brands Inc.*, 995 F.Supp.2d 274, 288 (S.D.N.Y. 2014).

### B. PLAINTIFFS HAVE STATED A CLAIM UNDER DMPEA.

PCH argues that the Plaintiffs may not bring this action under the DMPEA because the only private rights of action afforded by the DMPEA are those set forth in 39 U.S.C. § 3017(e). That section explicitly provides that a private plaintiff may enjoin or seek monetary damages from an individual that sends the plaintiff sweepstake or contest mailings after the plaintiff properly provides notice to the individual that the plaintiff does not wish to receive the same. However, that express right granted in a separate setting does not bar Plaintiffs from recovering under the different section 3001.

It is important to note that the private rights of action set forth in § 3017(e) deal with mailed communications that are deemed nonmailable only because the recipient has given notice of his or her desire to not receive said communications. 39 U.S.C. § 3017(c), *et seq*; see also H.R. 170, 106th Congress (Nov. 2, 1999), which noted that § 3017(b) ("[d]eclares nonmailable any skill contest or sweepstakes otherwise legally acceptable in the mails."). In this case, the Plaintiffs have clearly alleged that the mailed communications are illegal mailings under 39 U.S.C. § 3001(k)—that such mailings are illegal **because of their content** and not because of a failure to respect a "no mail" request regarding otherwise legal material.  Section 3017(e) neither grants nor precludes the

assertion of a claim in this case.

PCH cites two cases in support of dismissal on standing grounds in which the Plaintiff appeared *pro se* - *Dowden v. Readers Digest Ass'n, Inc.*, 2002 WL 31548776 and *Harris v. Publishers Clearing House*, 2016 WL 1366654 (M.D. Tenn. Apr. 6, 2016). While the *Dowden* court did reject the plaintiff's DMPEA claim in part based on § 3017(e), the Court also held that the claimed violations of the DMPEA under § 3001(k)(3)(A) and § 3001(k)(5) were meritless based on actual review of the subject mailings. In such holding, the Court assumed that **a private right of action existed** "separate and apart from § 3017(e)." The *Harris* court follows in the footsteps of *Dowden*, presuming a private right of action aside from § 3017(e) and determining that the mailed correspondence did not violate § 3001(k)(3)(A) or 3001(k)(5). *Id.*, at 3. It does not appear in either case that the Plaintiff specifically pled that the respective defendants violated § 3001.

Assuming the same private right of action that the *Dowden* court did in analyzing for the non-§3017(e) claims, the Complaint in this case explicitly alleges that the content of the mailings violates § 3001(k)(3)(A), unlike the *Dowden* complaint. (Plaintiffs' Complaint, P72-76) *cf* (Schwaba Dec., Ex. 6). The grounds upon which the *Dowden* case was dismissed are clearly distinguishable from the present case, and this matter would survive the analysis applied by the court in *Dowden,* "presuming a private right of action" existed. *Dowden*, at 3.

Here, Plaintiffs **did allege** that Publishers Clearing House induced them to purchase items to increase their chance of winning different sweepstakes and prizes. (Complaint, ¶¶, 69-77). If anything, comparison of *Dowden* and *Harris* to the present case supports including a private right of action in the DMPEA. To the extent that *Dowden* and *Harris* are applicable to the present matter, they support the Plaintiffs' claims because they acknowledge an implied private right of

action and the distinction from § 3017(e) claims when a defendant deceptively induces a plaintiff to purchase items for increased chances of winning. For the foregoing reasons, the Plaintiffs have standing under the DMPEA to seek recourse for the Defendants' aggressive violations of § 3001.

**C.  PLAINTIFFS HAVE STATED A PRIVATE RIGHT OF ACTION UNDER CAN SPAM ACT AND SECTION 369e.**
**1.      Plaintiffs Have Standing Under Can Spam Act.**

The Plaintiffs have standing under the CAN-SPAM Act because Congress intended to create not just a private cause of action but also a private remedy. *Alexander v. Sandoval*, 532 US 275, 286 (2001). The CAN-SPAM Act provides express rights of action to the Federal Trade Commission (FTC), the Securities and Exchange Commission (SEC), the Federal Communications Commission (FCC), State attorneys general, other state agencies, Internet Service Providers (ISPs), and others.

Although the CAN-SPAM Act does not expressly provide an individual right of action for consumers who are victims of spammers, the Court should consider the U.S. Supreme Court's analysis in *Alexander v. Sandoval*, in which the Court determined that Title VI of the Civil Rights Act did not provide a cause of action to plaintiffs seeking to enforce disparate-impact regulations. In its analysis, the Court noted that no express private right of action existed, and thus asked whether Congress intended to create a private right to pursue a private remedy. Alexander, 532 US at 286.

Both the text of legislation and its legal context are fundamental in determining legislative intent. *Alexander*, 532 US at 288. The *Alexander* Court's analysis was limited to the text and the structure of the subject statutes, Title VI § 601 and 602. While § 601 provided that no person was to be subjected to discrimination, the language of § 602 explicitly provided for mandatory enforcement of § 601 by the federal government. This statutory structure was the tool used by the

Court to determine that there was no intent to create a private right. *Alexander*, 532 US at 288.

Considering the *Alexander* analysis, this Court should find that Congress intended to create not just a private cause of action but also a private remedy. Plaintiffs allege in their Complaint that if not for the Defendants' Can Spam Act violations, the Plaintiffs would not have purchased the products that they did. (Complaint, p.89). Despite the numerous provisions within the Can Spam Act dealing with enforcement, nothing under the Can Spam Act provides individuals with redress nor restitution for fraudulently induced purchases, despite the congressional finding that "perpet[uating] fraudulent schemes" is one of the motivations behind spammers. 15 U.S.C. § 7703(C)(1).

Given that the text of 15 U.S.C. § 7701, *et seq.*, do not provide harmed individuals with specific redress, and that the provisions governing the imposition of a civil suit by a state official on behalf of a harmed individual **are discretionary**, this Court should apply the *Alexander* court's analysis and find that Congress intended to create both a private right and a private remedy in the discretionary language of § 7706(f), and that the Can Spam Act therefore does provide a private right of action. Accordingly, this Court should hold that the Plaintiffs do not lack standing under the Can Spam Act.

### 2. Plaintiffs Have Standing Under GBL 369e.

The Plaintiffs have standing under GBL § 369-e because the Plaintiffs are members of the class that the statute was meant to protect, the legislative purpose in enacting § 369-e would be profoundly furthered by the recognition of a private right of action, and the creation of such an action would be consistent with the legislative scheme of § 369-e. *Goldman v. Simon Prop., Inc.*, 58 A.D.3d 208, 215 (N.Y. 2008). The Defendants are correct in their assertion that § 369-e does not provide an express private right of action. However, "courts will imply a private right of action

upon the examination of the following three factors: (1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." *Goldman*, 58 A.D.3d at 215. The most important factor in determining whether an implied private right of action exists is the third factor—"whether creation of such a right would be consistent with the legislative scheme." *Goldman*, 58 A.D.3d at 215.

The Defendant's reliance upon *Worldhomecenter.com, Inc.*, is misplaced. (D's Brief, p.7). *Worldhomecenter.com, Inc. v. KWC Am., Inc.*, 2011 WL 4352390 (S.D.N.Y. Sept. 15, 2011). Instead, this matter is more consistent with the holding in *Sheehy v. Big Flats Community Day*. 73 N.Y.2d 629, 633, 543 N.Y.S.2d 18, 20 (1989). The *Sheehy* court allowed a private right of action existed for plaintiffs against adult defendants who supplied them with alcohol while the plaintiffs were underage, resulting in injury to the plaintiffs. *Sheehy*, 543 N.Y.S.2d at 19.

As laid out in the Plaintiffs' Complaint, NY GBL § 369-e prohibits false, deceptive advertising and was intended to protect the recipients of such advertising. (Complaint, P.98-100); NY GBL § 369-e. Further, the imposition of civil damages by those injured by the proscribed conduct would certainly further the legislative intent of deterring such deceptive advertising practices.

This Court should operate as if the Legislature intended a private right of action if such a right is consistent with the legislative scheme. *Sheehy*, 543 N.Y.S.2d at 21. The *Sheehy* court ultimately held that such a right was inconsistent with the legislative scheme regarding the distribution of alcohol to minors because a separate civil remedy regarding such illegal distribution was enacted and because the plaintiff was not the intended beneficiary of such remedy. *Sheehy*, 543 N.Y.S.2d at 22. Unlike *Sheehy*, however, the present case does not involve a criminal statute

which is accompanied by a civil remedy for a certain class of people. *Sheehy*, 543 N.Y.S.2d at 22. While § 369-e provides the Attorney General the right to assume the role of a District Attorney and impose criminal penalties, there is no separate, corresponding statute granting the victims of deceitful advertisers the right to civil compensation. NY GBL § 369-e(7)-(8).

For the reasons stated above, this Court should find that the Plaintiffs are members of the class that the statute was meant to protect, the legislative purpose in enacting § 369-e would be profoundly furthered by the recognition of a private right of action, and the creation of such an action would be consistent with the legislative scheme of § 369-e, and that therefore, the Plaintiffs have standing under the implied right of action in § 369-e.

### D.  CLASS ACTION ALLEGATIONS ARE APPROPRIATE WHERE PLAINTIFFS MAY PURSUE THEIR CLAIMS IN NEW YORK.

#### 1.  New York Law Applies to the Nationwide Class Because The Defendants Chose New York Law To Apply.

PCH contends that Plaintiffs' class allegations fail because no Plaintiff is a New York resident and therefore no Plaintiff has standing to sue under GBL § 349. To the contrary, the Plaintiffs have alleged that the Defendants are longtime New York residents. A substantial amount of the acts and omissions complained of occurred in this District (New York). (Complaint, ¶21). That is sufficient to withstand a motion to dismiss pursuant to the holding in *Voronina v. Scores Holding Co., Inc.*, Mem. Opin., Case No. 16-cv-2477 (S.D.N.Y. 2017), in which the plaintiffs were models claiming the defendants violated § 349 by misappropriating their images in publications to promote their nightclub. The defendants moved to dismiss the claims on the grounds the alleged actions took place outside the State of New York, the plaintiffs being non-residents.  However, even non-resident plaintiffs may bring claims where the deceptive acts occurred in the state of New York. *Voronina*, at 11. *Voronina* found that rather than the residency of the parties, a § 349

claim may hinge on the strength of New York's connection to the deceptive acts. *Voronina*, at 11.

Moreover, as outlined above, PCH cannot escape class allegations under New York as it required New York law to govern any claims brought against them. PCH's Terms of Use states claims against them "shall be governed by the laws of the State of New York, excluding its conflicts-of-law principles." (Complaint, ¶62). In other words, they insisted on the application of New York regardless of whether a New York court would otherwise have applied the law of another jurisdiction. Defendants cannot avoid New York law where they insisted that New York law apply to any claim.

As a result, Plaintiffs' claims are similar to and perhaps even stronger than those in *Cruz,* in which the plaintiffs withstood a motion to dismiss a § 349 class action allegation where the defendant relied upon New York law in its terms of use documents. *Cruz*, 720 F.3d at 118. As in *Cruz*, PCH's terms of use provide for any claims to be governed by New York law. Any other result permits PCH to say "you can't sue us under any other state's law, and you can't sue us under New York law, either. You simply can't sue us." Plaintiffs' Section 349 class action allegations should be allowed to proceed.

**E.   DEFENDANTS' MOTION TO COMPEL ARBITRATION MUST FAIL**.

The Defendants cannot compel arbitration where the Terms of Use were not presented to the Plaintiffs. First, many of the Plaintiffs never visited the Defendants' website. Second, the Defendants' webpage may not have existed at the time the Plaintiffs would have used Defendants' website. Third, Plaintiffs would have no reason to know the "Terms of Use" constituted an agreement or a contract just from reviewing the miniscule subscript on a registration page that disclaimed any commercial purpose. Fourth, the Terms of Use of the Defendants' webpage was an impermissible browsewrap offer to which the Plaintiffs never assented. Finally, the arbitration

clause is procedurally and substantively unconscionable.

The Federal Arbitration Act ("FAA") was intended to place arbitration agreements "upon the same footing as" other types of contracts. *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 511 (1974) (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924)). As such, "arbitration under the Act is a matter of consent, not coercion," and "the FAA does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478-479 (1989).

In *Granite Rock Co. v. International Brotherhood of Teamsters*, the Supreme Court explained that "[a] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." 561 U.S. 287, 297 (2010). "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Id.* Such threshold issues for judicial determination "always include whether the clause was agreed to" by both the party seeking to compel arbitration and the party it seeks to compel. *See id.*

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen*, 763 F.3d at 1175 (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)). The question of whether the Defendants and any of the Plaintiffs entered into an agreement to arbitrate is analyzed under ordinary state law principles governing contract formation. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). In New York, a contract is formed when the parties give their mutual assent to the terms of a contact and there is consideration. 2 PJI 3d 4:1 at 626 (2010); see *Maas v. Cornell University*, 94 NY2d 87, 93 (1999). Mutual assent is often referred to as a meeting

of the minds on the essential terms of a contract. *Express Industries and Terminal Corp. v. New York State Department of Transportation*, 93 NY2d 584 (1999). Whether a contract has been made must be determined in light of the totality of the parties conduct and communications. *Zheng v. City of New York*, 19 NY3d 556, 572, quoting *Brown Bros. Elec. Construc. v. Beam Constr. Corp*., 41 NY2d 397, 400, (1977), without placing disproportionate emphasis . . . on any single act, phrase or other expression" *Zheng*, 19 NY3d at 572, quoting *Brown Bros*., 41 NY2d at 399-400).  Under New York law, a contract is unenforceable when there has been no meeting of the minds between the parties regarding its material terms *Brando v. Urban*, 182 AD2d 287, 289 (2d Dept 1992).

### 1.    Non-website using Plaintiffs Were Not Covered by Contract

The Defendants motion to compel arbitration hinges upon an arbitration clause found on their website. (Renner Dec., Ex. 1). Defendant does not contend, nor could they, that Plaintiffs who have never used the website should have their claims governed by a provision on the website. None of the mailings sent to Plaintiffs contained an arbitration clause or any Terms of Use. (See e.g. Schwaba Dec., Ex. 11). Clearly, Plaintiffs could never assent to the terms of a contract that were never presented to them. Any claims presented by Plaintiffs that did not use the website must remain in this Court.

### 2.    Defendants' Failed to Prove Their Webpage Was Seen by Plaintiffs.

Defendants' argument for arbitration hinges upon a registration page that contained a "Terms of Use" immediately below the "Continue" button of the page. (Renner Dec., Ex. 1, Dkt. 16-1).  The Defendants' page is described as existing "as of May 22, 2018," approximately one month *after* Plaintiffs' Complaint was filed. (Renner Dec., ¶ 1, Dkt. 16). Defendants have not asserted that the Terms of Use hyperlink existed prior to May 22, 2018. The Plaintiffs have all now testified that they never saw such webpage. (Wright Dec. p. 3, Gillespie Dec., ¶6, Ferrell ¶6,

Williams ¶6, Jessie ¶5).

Moreover, the Plaintiffs investigation of Defendants' website shows a registration page very different in character from that offered by the Defendant. (Schwaba Dec., Ex. 8). On this registration webpage, there is no Terms of Use hyperlink shown, certainly not next to the "Submit" button, and another where the Terms of Use requires scrolling down the page to view. (Schwaba Dec., Ex. 9). Instead, the Terms of Use hyperlink falls well below the "Continue" box at the very bottom of the webpage. The party moving to compel arbitration "must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.' " *Hines v. Overstock.com, Inc.* , 380 Fed.Appx. 22, 24 (2d Cir.2010) (summary order). Furthermore, Defendants' emails to Plaintiffs do not include a "Terms of Use" hyperlink but instead lead to other webpages that do not contain a "Terms of Use" anywhere near the action boxes on the screen. (Schwaba Dec., Ex. 10). The Defendants' attempt to compel arbitration must fail because they have failed to show an agreement to arbitrate existed. At the very least, Plaintiffs should be entitled to discovery to determine what webpages were published by Defendants and would have been encountered by Plaintiffs as they used the website.

### 3.     Website Using Plaintiffs Were Not Presented With A Contract.

Whether offering contract terms on paper, or as here, on a website, the offeror must provide sufficiently conspicuous notice of both the terms and the means of assent so that a reasonably prudent consumer would be on notice that contract terms are at issue and of what action on the consumer's part will constitute assent to those terms. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (applying California law and holding that "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to

those terms by consumers are essential if online bargaining is to have integrity and credibility").

The Defendants rely on *Meyer v. Uber Technologies, Inc.,* 868 F.3d 66 (2017) to suggest the Plaintiffs' claims are governed by arbitration. This matter is different from *Meyer* in two fundamental ways. First, as the Defendant argued in *Meyer*, it was not only the conspicuousness of the text disclosing the Terms of Service that put Plaintiff on notice of their existence; it was the context of the specific transaction. *Meyer*, 868 F.3d at 80; (Schwaba Dec., Ex. 4) ("the entire purpose of registering was to form an economic relationship with Uber, whereby Uber would facilitate the provision of services *in exchange for money*." (Schwaba Dec., Ex. 4, p. 32-33, (emphasis not added).  Second, Uber presented the consumer with a payment screen that requested a credit card information, followed by the "Register" dialog box, followed by dialog boxes offering payment by Paypal or Google Wallet, followed by the "Terms of Service" hyperlink. All of these entries were visible on one page without scrolling. The text of payment and Register buttons were colored in black and grey over a white background. The "Terms of Service" hyperlink was a bright blue color that stood out over a white background. The hyperlink was, although smaller, in a comparable size font. *Meyer*, 868 F.3d at 78.

Unlike *Meyer*, the Plaintiffs in this matter were purportedly presented with a Registration Page based on a distinct promise that no purchase is necessary. The Defendants' purported registration page represents "Its FREE – Enter Now" at the top of the dialog box where personal information is entered. These promises are what entice the Plaintiffs to register with the Defendants. Therefore, the Plaintiffs have no reason to review the "terms" of a relationship that is not economic in nature. Moreover, once they registered, the Plaintiffs never would have been presented with the registration page again, bypassing any hyperlink related to the terms of use. (See e.g. Gillespie Dec., ¶4).

The PCH interface is very different from that found in *Meyer*. First, the PCH screen offered by the Plaintiff has a white background with red "Submit" button. (Schwaba Dec., Ex. 8). The "Submit" button is at the very bottom of the screen, with nothing below it as presented. *Id*. The Defendants also presented an alternative registration screen with an orange background with a bright blue "Continue" button similar to that offered by Defendants that required scrolling down to see any "Terms of Use" hyperlink. (Schwaba Dec., Ex. 9). Even the screen presented by the Defendants fails the analysis used in *Meyer*. The PCH screen is a red background with white lettering. (Renner Dec., Ex. 1). The "Continue" dialog box is a big, bright blue box with white lettering that matches the conspicuousness of the "Win it All" blue ribbon above. After personal information is entered, PCH offers two boxes, above the "Continue" button, to click to learn more about other chances of winning and about PCH Search&Win, each with hyperlinks to PCH's privacy policy. *Id*. No such click box is offered to learn of the "Terms of Use." Below the "Continue" box is the "Terms of Use" hyperlink, one of six hyperlinks on the page. Unlike *Meyer*, the "Terms of Use" hyperlink has no predicate language informing the user that clicking the "Continue" box is contingent upon accepting the terms of service. Instead, the user is offered no significance of the Terms hyperlink, whether the Terms are for the website, the sweepstakes, or some other interaction with PCH.

### 4.  PCH's Purported Terms of Use Constituted an Impermissible Browsewrap Agreement.

Contracts formed over the internet fall into two main categories: clickwrap agreements, where users are required to click on a check box or "I agree" button after being presented with a list of terms and conditions; and "browsewrap" agreements, where the terms and conditions are available by clicking on a hyperlink somewhere on the page. *Nguyen*, 763 F.3d at 1175-76 (citations omitted). Some presentations of contract terms online do not fit neatly under either the

"clickwrap" or "browsewrap" umbrella. *See Fteja v. Facebook, Inc.* 841 F. Supp.2d 829, 837 (S.D.N.Y. 2012).

In contrast to clickwrap agreements, which "have been routinely upheld by circuit and district courts," *United States v. Drew*, 259 F.R.D. 449, 462 n. 22 (C.D. Cal. 2009) (internal quotation marks and citations omitted), courts have generally enforced browsewrap agreements only against corporations who access a site repeatedly or who were placed on notice of the agreement's terms through some other means, and rarely enforce them against individual consumers. *Berkson v. Gogo LLC*, 97 F. Supp.2d 359, 396 (E.D.N.Y. 2015) (collecting cases); *see also* Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 474 (2006) (same). This greater reluctance on the part of courts to enforce browsewrap agreements no doubt stems from the fact that "[u]nlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly," thus making these agreements anomalous within the canon of contract law. *See Nguyen*, 763 F.3d at 1176. "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Be In, Inc. v. Google Inc.*, No. 12–CV–03373–LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013). Because browsewrap agreements "are a powerful means of binding users with very little affirmative assent," *id.* at *9, courts are very careful about the circumstances in which they will find browsewrap agreements enforceable.

The *Nguyen* Court held that despite the conspicuousness of the Terms of Use hyperlinks and their close proximity to relevant buttons, the Barnes & Noble website did not give constructive notice of the Terms of Use where it "otherwise provide[d] no notice to users nor prompt[ed] them to take any affirmative action to manifest assent." *Id.* at 1179. The Court in *Nguyen* also based its

holding on "courts' traditional reluctance to enforce browsewrap agreements against individual consumers." *Id.* at 1178. *See, e.g.*, *In re Zappos.com, Inc. Customer Data Sec. Breach Litig.*, 893 F. Supp.2d 1058, 1064 (D. Nev. 2012) ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links" and refusing to enforce browsewrap agreement against consumer); *Hines v. Overstock.com, Inc.*, 668 F. Supp.2d 362, 367 (E.D.N.Y. 2009) (the plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen—an action that was not required to effectuate her purchase" so she lacked adequate notice of the terms); *Pollstar v. Gigmania, Ltd.*, 170 F. Supp.2d 974, 981 (E.D. Cal. 2000) (denying motion to dismiss based on terms contained in a browsewrap agreement where the text notifying users of the terms appeared in small gray text on a gray background).

Defendants' Terms of Use is also very different from the conspicuous notice in *Fteja v. Facebook, Inc.*, 841 F. Supp.2d 829 (S.D.N.Y. 2012), where the text below the "sign up" button consisted of a single, 18-word sentence (hereafter, "Agreement Sentence"), of which the hyperlinked phrase "Terms of service" were words 16 through 18: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." *Id.* at 835. No such explanation as to the significance of the Terms of Use for PCH occurred in this matter.

As explained in *Berkson v. Gogo Inc.*, 97 F.Supp.3d 359 (E.D.N.Y. 2015), lower courts upholding sign-in-wrap arrangements, such as the one presented in *Fteja,* have done so under three circumstances. They emphasized notice and an effective opportunity to access terms and conditions. *First,* where the hyperlinked "terms and conditions" is next to the only button that will allow the user to continue use of the website. *Berkson*, 97 F.Supp.3d at 400-401; *see, e.g., Crawford v. Beachbody, LLC,* No. 14–CV–1583, 2014 WL 6606563, at *3 (S.D.Cal. Nov. 5,

2014) (forum selection clause binding where consumer clicked on button marked "Place Order" and above button was statement informing user that by clicking the button user was subject to the website's "terms and conditions," which were available in the same screen via hyperlink); *Starke v. Gilt Groupe, Inc.,* No. 13–CV–5497, 2014 WL 1652225, at \*2–3 (S.D.N.Y. Apr. 24, 2014) (arbitration clause in "terms of use" binding where consumer clicked "Shop Now" button next to statement that informed user that "the consumer will become a Gilt member and agrees to be bound by the "Terms of Membership," which were available next to the button as a hyperlink"); *Swift v. Zynga Game Network, Inc.,* 805 F.Supp.2d 904, 908, 912 (N.D.Cal.2011) (arbitration clause enforceable where user clicked on button marked "accept," below which was statement in small grey font indicating that clicking on the button meant accepting the hyperlinked "terms of service").

Second, where the user "signed up" to the website with a clickwrap agreement and was presented with hyperlinks to the "terms of use" on subsequent visits. *Berkson*, 97 F.Supp.3d at 401; s*ee also, e.g., Nicosia v. Amazon.com, Inc.,* No. 14–CV–4513, 84 F.Supp.3d 142, 151–53, 2015 WL 500180, at \*7 (E.D.N.Y. Feb. 4, 2015) (arbitration clause enforceable where user clicked box acknowledging terms at initial signup to website and was presented with hyperlink at top of webpage to "terms of use" multiple times after completing purchases), *appeal filed,* No. 15–CV–0423 (2d Cir. Feb. 13, 2015); *Zaltz v. JDATE,* 952 F.Supp.2d 439, 454 (E.D.N.Y.2013) (forum selection clause binding where user had to assent to clickwrap agreement and clicked button marked "accept," next to which was hyperlink to "terms of use," to sign up to website and to renew her membership).

Third, notice of the hyperlinked "terms and conditions" must be present on multiple successive webpages of the site. *Berkson*, 97 F.Supp.3d at 401; *see also, e.g., Major v.*

*McCallister,* 302 S.W.3d 227, 230–31 (Mo.Ct.App.S.Dist.2009) (forum selection clause enforceable where hyperlink to "terms and conditions" was presented on multiple successive webpages and the final step in the website's signup process was to click a button next to which was the phrase: "By submitting you agree to the Terms of Use").

PCH's Terms of Use reveal none of these conditions have been satisfied. Although the first condition of the *Fteja* factors may be satisfied if Defendants' webpage is accepted, Plaintiffs have offered alternative webpages where the TOU hyperlink is distant from the "Continue" box. (Schwaba Dec., Ex. 8). Second, no clickwrap agreement was shown, nor was the TOU hyperlink revealed on subsequent visits. (See e.g., Schwaba Dec., Exs. 10 and 12). Finally, the TOU were not presented on the multiple successive webpages of the site. (Schwaba Dec., Ex. 9). Defendants' reliance on *Fteja* is misplaced.

### 5. PCH Did Not Present the Terms of Use Through a Valid Clickwrap Agreement.

The reference to the Terms of Use on pch.com fell into the "browsewrap" category of online contract offers rather than the "clickwrap" category because it "does not require an express agreement to the 'Terms and Conditions' of its website." The pch.com website design offered by the Defendant differs in two important respects from the sorts of clickwrap agreements that courts have enforced: first, it does not present the proposed contract terms, or a conspicuous link to those terms, on the same page as the button that users must click to indicate assent to those terms; and the language and layout of the site do not clearly communicate that clicking the button labeled "Continue" would manifest assent to the Terms of Use.

Not surprisingly, Plaintiffs who visited the Publisher's Clearing House website testified that they never saw any Terms of Use when on the website and were not prompted to review any such terms. (Wright Dec., p. 2; Gillespie Dec., ¶ 3; Ferrell Dec., ¶3; Williams Dec., ¶4; Jessie Dec.,

¶ 3; Samens Dec., ¶ 4).  This is significant because courts that have enforced clickwrap agreements have emphasized the fact that the terms of those agreements were prominently featured on the webpages that users needed to pass through in order to complete an order.

For example, in *Tompkins v. 23andMe, Inc.*, No. 5:13-cv-05682-LHK, 2014 WL 2903752 (N.D. Cal. June 25, 2014). The court in *Tompkins* held that the Terms of Service ("TOS") on 23andMe's website, which contained an arbitration clause, did not become binding on plaintiffs when they purchased their DNA kits because up to that point the TOS only appeared as a hyperlink at the bottom of certain webpages and "reference to the TOS never appears in the text, sidebar, or at the top of the webpage prior to purchase of a DNA kit." *Id.* at *2.) In contrast, in *Mohamed v. Uber Technologies, Inc.*, 109 F. Supp.3d 1185 (N.D. Cal. 2015), for example, people who wished to drive for the ride-sharing company Uber were confronted with a message when they tried to sign in to the site stating, "By clicking below, you acknowledge that you agree to all the contracts above." *Id.* at 1190-91. If the user clicked the button labeled "Yes, I agree," a new page appeared that stated, "PLEASE CONFIRM THAT YOU HAVE REVIEWED ALL THE DOCUMENTS AND AGREE TO ALL THE NEW CONTRACTS" and provided buttons for users to click either "YES, I AGREE" or "NO." *Id.* at 1191. *See also Hancock v. Am. Tel. and Tel. Co., Inc.*, 701 F.3d 1248, 1257-58 (10th Cir. 2012) (enforcing clickwrap agreement where users of U-Verse Internet service had to pass through a webpage with the terms in a scrolling window and click a button labeled "I agree" in order to use the service); *Bar-Ayal v. Time Warner Cable Inc.*, No. 03-cv-9905 (KMW), 2006 WL 2990032, at *9- 10 (S.D.N.Y. Oct. 16, 2006) (enforcing agreement where software user was presented with eight screens containing contract terms and had to click "accept" on each one, followed by a final screen and "accept" button that they had to click before installing the software, which stated that "I understand that by clicking the Accept button below, I am

agreeing to be bound by all of the terms and conditions detailed therein, as if I had written my signature to each of the agreements") and

According to the screenshots provided by Defendant, the pch.com website introduces its Terms of Use in the same inconspicuous manner found insufficient at the checkout stage of the 23andMe website.  Like 23andMe's site, a reference to the pch.com Terms of Use "never appears in the text, sidebar, or at the top of the webpage prior to" a user clicking on the button to register. 2014 WL 2903752, at *2; (Renner Dec., Ex 1, Dkt. No. 16-1). As then-Judge Sotomayor put it in *Specht v. Netscape Commc'ns Corp.*, "there is no reason to assume that viewers will scroll through to subsequent screens simply because screens are there." *Specht*, 306 F.3d at 32.

      **6.**     **PCH's Arbitration Clause Was Unconscionable.**

Even if the Court concludes that a contract was formed between the PCH Defendants and the Plaintiffs who visited pch.com, that does not end the inquiry. Under the FAA's "savings clause," an arbitration clause may be invalidated "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This means that "agreements to arbitrate [may] be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *AT & T Mobility LLC v. Concepcion*, 131 S.Ct. at 1746.

The arbitration provision in PCH's Terms of Service was both procedurally and substantively unconscionable under New York law. It was procedurally unconscionable because it was contained in terms of adhesion that the plaintiffs had no ability to negotiate, its terms were not clearly communicated, and their harshness would come as a surprise given the reasonable expectations of consumers. The arbitration provision's substantively unconscionable terms include: 1) the distant forum provision requiring all arbitration proceedings to take place in New York; 2) the "loser pays" provision that risks burdening plaintiffs with PCH's arbitration costs and

PLAINTIFFS' MEMORANDUM OF LAW
IN RESPONSE TO DEFENDANTS'
MOTION TO DISMISS

attorneys' fees; 3) the unilateral modification clause permitting PCH to alter the terms of the arbitration provision at any time; and 4) the severe limitations on remedies that, while not contained within the paragraph dealing with arbitration, still pertain to the arbitration provision because they would limit the relief that an arbitrator would be able to provide to an aggrieved consumer. Because unconscionability permeates the arbitration provision, its unconscionable terms cannot be severed and the clause should be stricken in its entirety and not enforced against the plaintiffs who visited pch.com.

### a.   PCH Arbitration Clause Was Procedurally Unconscionable.

Procedural unconscionability is broadly conceived to encompass not only the employment of sharp practices and the use of fine print and convoluted language, but a lack of understanding and an inequality of bargaining power." *Berkson, supra,* citing *Am. Airlines v. Wolens*, 513 U.S. 219, 249 (1995).

The Plaintiffs are at a distinct disadvantage to the Defendants in terms of bargaining power in this matter. Most of the Plaintiffs are elderly and living on fixed incomes, compared to a nationwide corporation with thousands of employees. Moreover, the arbitration clause in the TOU can be considered a surprise. The paragraph regarding arbitration is relatively inconspicuous, appearing as the thirty-second of thirty-eight numbered paragraphs in the Terms of Use. (Renner Dec. Exhs. 2-4). Courts have found surprise, and judged contract terms procedurally unconscionable as a result, when they were part of even shorter contracts than the PCH Terms of Use. *See, e.g.*, *Newton v. Am. Debt Services, Inc.*, 549 Fed. Appx. 692, 694 (9th Cir. 2013) (finding surprise where arbitration provision was printed on reverse side of one-page document); *Gutierrez v. Autowest, Inc.*, 114 Cal.App.4th 77, 89 (2003) (finding procedural unconscionability where arbitration provision appeared on opposite side of automobile lease from the plaintiff's signature

and the plaintiff was not required to initial it). In short, the presence of both oppression and surprise makes the PCH's Terms of Use procedurally unconscionable to a significant degree.

### b.    PCH Arbitration Clause Was Substantively Unconscionable.

The PCH Arbitration Clause is substantively unconscionable for a variety of reasons. First, the clause prohibits the Plaintiffs from acquiring any real damages for their claims. Second, the clause requires Plaintiffs to travel to New York to arbitrate their claims. Third, the clause allows the Defendant to modify its terms at will. Finally, the clause negates any real recovery to the Plaintiff, as it nullifies state and federal consumer protections.

"'[T]he substantive element [of unconscionability] looks to the content of the contract, per se,'" *Naval v. HIP Network Servs. IPA, Inc*., 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (quoting *State v. Wolowitz*, 96 A.D.2d 47, 67 (2d Dep't 1983)), and "entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged. An unconscionable contract is one which "'is so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.'" *Id*. at 10 (quoting *Mandel v. Liebman*, 303 N.Y. 88, 94 (1951)).

The arbitration clause also precludes Plaintiffs from any meaningful recovery, precluding an award of consequential damages, including any award for punitive or incidental damage, attorneys fees and costs, or any multipliers of damages. (Renner Dec., Ex. 2, ¶32). This contrasts with New York GBL § 349 allowing for treble damages, court costs and attorneys' fees. (N.Y. GBL § 349(h)). Such a construct was negated in *Eisen v. Venulum Ltd*., 244 F.Supp.3d 324, 344-345 (W.D.N.Y. 2017) (defendant's arbitration clause rejected where it sought to impose laws of British Virgin Islands that contrasted with state and federal consumer protections laws). See also

*Brenner v. Gen. Plumbing Corp.*, 13 N.Y.S.3d 849 (N.Y. Civ. Ct. 2015) citing *State of New York v. Wolowitz*, 96 A.D.2d 47, 67, 468 N.Y.S.2d 131, 145 (1983). ("Examples of unreasonably favorable contractual provisions include unfair limitations on consequential damages and improper disclaimers of warranty.") Considering most Plaintiffs have claims of less than a few hundred dollars, precluding consequential damages turns any arbitration into a negative value proposition for the Plaintiffs.

The version of the arbitration provision states in two separate places that all arbitrations must take place in New York. (Renner Dec. Ex. 2, ¶32). None of the Plaintiffs reside in New York and all live a significant distance from New York: in Kentucky (Williams), North Carolina (Wright, Ferrell), South Carolina (Gillespie), Tennessee (Phillips), Indiana (Wilhelm), Alabama (Hamilton), Wisconsin (Samens), Michigan (Jessie), Florida (Rife), Oklahoma (Holden), Washington state (Eko), and California (Soudjian). Moreover, PCH markets its services throughout the country, and the proposed nationwide class that the plaintiffs seek to represent contains thousands of consumers from all over the United States. Although Defendants argue AAA rules allow Plaintiffs to appear for the arbitration over the telephone, the Court can take judicial notice of the disadvantage a telephone appearance may play with respect to such a hearing. *See Newton v. Am. Debt Services, Inc.*, 549 Fed.Appx. at 694 (finding substantively unconscionable a provision requiring a California resident to arbitrate her claims in Tulsa, Oklahoma, the defendant's corporate headquarters); and *Comb v. PayPal, Inc.*, 218 F. Supp.2d 1165, 1176-77 (N.D. Cal. 2002) (in proposed nationwide class action where PayPal required all disputes to be arbitrated in Santa Clara County, California, holding the forum selection provision substantively unconscionable). Even a telephonic hearing requires a $200 filing fee. (Schwaba Dec., Ex. 5)

Through its multiple unconscionable terms, Publishers Clearing House "has devised an

arbitration agreement that functions as a thumb on [its] side of the scale" when disputes arise with consumers in desperate financial circumstances who use its website in an effort to find debt relief. *See Adams*, 279 F.3d at 892. Where a contract provision, like the arbitration clause here, is "so permeated by substantive unconscionability that it cannot be cured by severance or any other action short of rewriting" it, this Court has held that the "taint[ed]" provision should be stricken in its entirety as unenforceable. *Nagrampa v. Mailcoups Inc.*, 469 F.3d 1257, 1293 (9th Cir. 2006). The Court should do the same here.

## IV.    CONCLUSION

Plaintiffs have shown their claims should be allowed to move forward. The Plaintiffs sufficiently alleged deception, causation and injury according to Section 349. The Plaintiffs stated class allegations pertaining to a nationwide class based on PCH's choice of law provision. Finally, the Defendants are not entitled to arbitration where their Terms of Use did not create a contract, was an impermissible browsewrap agreement, and was unconscionable. Defendants' Motion to Dismiss should be denied.

Dated this 19th day of June, 2018.

**SCHWABA LAW FIRM**

s/ Andrew J. Schwaba
Andrew J. Schwaba
NC Bar No.:  36455
212 North Tryon Street
Suite 1725
Charlotte, NC 28281
(704) 370-0220
(704) 370-0210 (fax)
aschwaba@schwabalaw.com

**NICHOLSON LAW FIRM, P.A.**
Edward H. Nicholson, Jr.
NC Bar No. 36123
212 North Tryon Street

PLAINTIFFS' MEMORANDUM OF LAW
IN RESPONSE TO DEFENDANTS'
MOTION TO DISMISS

Suite 1725
Charlotte, NC 28281
(704) 223-2406 (telephone)
nicholsonshumaker@att.net
*(pro hac vice motion to be filed)*


**ZECCOLA & SELINGER, LLC**
John S. Selinger
NY Bar No. 2663698
2127 Crompond Rd.
Suite 205
Cortlandt Manor, NY 10567
(914) 402-7290
(914) 737-4260
john@zslawyers.com


*Attorneys for Plaintiffs*

PLAINTIFFS' MEMORANDUM OF LAW
IN RESPONSE TO DEFENDANTS'
MOTION TO DISMISS